AUGUSTUS F. EGGERS AND R. ARTHUR HELLER, PROSE-
CUTORS, *v.* THE MAYOR AND COMMON COUNCIL OF
THE CITY OF NEWARK ET AL.

Submitted June 8, 1908—Decided December 30, 1908.

1. If a party to a cause is asserting a legal right in a lawful manner his motives and the underlying reasons for his action are immaterial in law.
2. The by-law adopted by the board of street and water commissioners of the city of Newark, pursuant to legislative authority, which by-law requires advertisement between first and second readings of ordinances not based on "notice of intention," could not, at the time of action by the said board on the ordinance brought up in this case, be suspended so as to render advertisement unnecessary and permit the introduction and passage of the ordinance at the same meeting.

On *certiorari.*

Before Justices GARRISON, SWAYZE and PARKER.

For the prosecutors, *Chandler W. Riker* and *Francis Child.*

For the North Jersey Street Railway Company and the Consolidated Traction Company, *Frank Bergen* and *Richard V. Lindabury.*

For the other defendants, *Malcolm MacLear.*

The opinion of the court was delivered by

PARKER, J.  This writ brings up for review an ordinance of the board of street and water commissioners of the city of Newark, entitled:

"An ordinance validating and confirming a certain contract or agreement made on the seventeenth day of January, 1905, by the mayor of the city of Newark and the city counsel of the said city, on behalf of the said city and the Consolidated Traction Company and the North Jersey Street Railway Company, lessee, providing for and defining the terms and conditions upon which the lines of street railways owned or operated by the said street railway companies in any territory heretofore or hereafter annexed to the said city of Newark shall be operated; and further providing and defining the manner in which certain gross receipts provided for in a certain ordinance passed July 13, 1893, entitled 'An ordinance to authorize and empower the Consolidated Traction Company, a corporation incorporated under the laws of the State of New Jersey, to locate, construct, operate and maintain street railways and appurtenances over and through certain streets, avenues and highways in the city of Newark,' shall be computed and determined," passed by the board of street and water commissioners on the 19th day of January, A. D. 1905, and approved by the mayor of said city on the 20th day of January, A. D. 1905.

The contract recited in this somewhat lengthy title is de-

pendent on the ordinance for its validity. For an understanding of the scope and effect of the contract and ordinance, a short outline of the matters leading up to the contract may as well be presented here.

As far back as 1890, in the early days of electric street railways, the city of Newark required of the railway company asking permission to operate such railway in the streets, a payment in addition to general taxes and existing license fees, of "five per cent. of the gross earnings received from passenger traffic within the city limits from lines on which electricity is used as a motive power." Similar action by ordinance was taken afterward from time to time with respect to other lines, especially in 1892, in the case of the Newark and South Orange Railway Company, when the same language as quoted was used; and in 1893, in the case of the Consolidated Traction Company, when the five per cent. provisions of the ordinance of 1892 were expressly made applicable by citation and reference. But difficulties soon arose, due to the facts that many car lines already extended beyond the city limits, and others from time to time were so extended, and the parties disagreed as to the interpretation of the clause in question. In addition to this, new territory was added from time to time, by absorption of other municipalities which themselves had agreements with the car lines; and finally the street railroads themselves were all merged into or acquired by the North Jersey Street Railway. Settlements were made from time to time by agreement between the city and the companies as to amounts then due; but no basis was fixed for ascertaining these amounts in the future. To accomplish this, the contract and ordinance of 1905 were drafted by joint action of counsel for the city and the railway company, and after informal conferences the contract was executed by the North Jersey Street Railway Company and its counsel, and signed by the mayor of Newark and the city counsel, and the ordinance was presented to the board of street and water commissioners at a meeting on January 19th, 1905, and put through three readings and final passage at the one meeting. It is this action which prosecutors attack.

It is objected at the outset that prosecutors have no legiti-
mate standing.    It appears by the proof that prosecutor
Eggers was president of the board of street and water commis-
sioners at the time the ordinance in question was passed, was
present at the meeting and voted for it; and the claim is made
that this estops him from attacking it.    It also appears that
on December 29th, 1905, the common council directed the
institution of proceedings and the employment of special
counsel to set aside the agreement and ordinance in ques-
tion, such proceedings to be brought "in the name of the
city or otherwise;" and that the other prosecutor, Heller,
appeared as such at the suggestion of such special counsel,
assumed no financial responsibility and employed no counsel
in his own behalf.

We find nothing in the attack on Mr. Heller's *status* that
bars him from prosecuting.    As a party, he is responsible to
the defendants for costs if defeated; and as he appears vol-
untarily and thereby assumes that responsibility, neither his
motive, nor the reason for his action, nor the question how
his counsel are to be paid, is a material inquiry, if he is assert-
ing a legal right in a lawful manner.    *Davis* v. *Flagg,* 8
*Stew. Eq.* 491; *Hodge* v. *United States Steel Corporation,*
19 *Dick. Ch. Rep.* 111.    If this be the case as to Heller, the
*status* of Eggers becomes an academic question.

But it is further objected that a mere taxpayer as such
is not entitled to question the ordinance brought up by this
writ, because it does not appear that he suffers any special
injury from the proceedings under review.    Counsel rely on
the case of *Jersey City* v. *Traphagen,* 24 *Vroom* 434, as con-
trolling in this case.    But if it can be said that the present
complaint falls within the lines of the Traphagen case, the
question is settled by the later cases of *Oliver* v. *Jersey City,*
34 *Id.* 96, in which the opinion of the Supreme Court on this
point was expressly approved by the Court of Errors and Ap-
peals in 34 *Id.* 634, on error; and *Rehill* v. *East Newark,*
44 *Id.* 220, 222.    For reasons appearing more fully else-
where in this opinion, the ordinance directly affects the
revenues of the city; and while there may perhaps be room for

dispute as to whether its net results in the future will be financially injurious or beneficial to the city, there can be no question that by it, important and valuable rights of the city, both present and prospective, are surrendered.    We are clearly of opinion, therefore, that the municipal action is of the character that entitles a taxpayer to intervene and question its regularity.    And on this branch of the case the first reason advanced by prosecutors seems decisive, viz., that the ordinance was not legally passed, and for the reason that its attempted passage by the board of street and water commissioners was in violation of a by-law of that body, which reads as follows:

"Every ordinance shall be read by the clerk when presented, and shall be ordered to a second reading; but no ordinance shall have a second reading at the meeting at which it was presented or reported to the board, without the assent of two-thirds of the members present.    Nor shall any ordinance have a third reading at the meeting at which it is presented without the assent of two-thirds of the members present.    *All ordinances except those which are based on a published notice of intention shall, between their first and second readings, be published at least five times in at least two of the approved newspapers designated by the board."*

The ordinance fell within the last clause, but no publication was had as required in that clause.    On the contrary, the ordinance was read three times, put on its final passage, and passed, all at the one meeting.

The defendant companies undertake to meet this criticism in two ways.    They say, first, that the proceeding was validated by a "suspension of the rules."    The minutes show that Commissioner Ballard asked unanimous consent for the introduction of the ordinance, which was given, and the ordinance introduced and "read for the first time, and on motion the rules were suspended and the ordinance was taken up and read for a second time, and, there being no amendments, passed second reading and was ordered to a third and final reading by a unanimous vote.    *    *    *    Commissioner Ballard moved that we suspend section 2 of chapter 15 of the by-laws

for the purpose of giving this ordinance a third and final reading, which motion was unanimously passed. The ordinance was taken up and read for a third time and passed a third and final reading by a unanimous vote."

There is some confusion in the case on the question whether section 2 of chapter 15 is the section quoted, or whether it is section 2 of chapter 16. The matter is explained by the allegation of counsel for the defendant companies that a new edition of the by-laws, revised in March, 1905, after the meeting in question, was introduced in evidence by prosecutors as the by-laws in force at the time instead of the previous edition, and a printed book, not put in evidence, but purporting to be the by-laws of 1903 and in force in January, 1905, was submitted by defendants' counsel on the argument. A comparison of the two compilations shows that they are identical with the exception of an additional chapter interpolated in the revision of 1905, so that chapters 14 and 15 of the old by-laws became chapters 15 and 16, respectively, of the new ones. The edition of 1905 was testified to without objection or challenge as that in force in January, 1905. If this be so, then section 2 of chapter 15 of that edition, relating to inspection of public works, had no bearing at all on the passage of an ordinance and its suspension, if effective, was useless. If, on the other hand, we accept the assertion of defendants' counsel that section 2 of chapter 15 of the old edition (sixteen of new edition) was referred to in the motion, we find it as above quoted, and the question before us is whether there was a valid suspension of its provisions. We think not. By the first section of the act constituting the board (*Pamph. L.* 1891, *p.* 249; *Gen. Stat., pp.* 465-467, inclusive) it was enacted that they "may make, establish, alter, modify or repeal such by-laws, rules and regulations, and pass such resolutions for the government of the proceedings of such board   *   *   * and the transaction of its business as such board may deem advisable." Pursuant to this provision the by-laws already referred to were adopted, and constituted the working regulations governing its action so far as not regulated by the higher authority of the statute. And as the powers given

by that statute do not include the power to suspend the by-laws, but only to alter, modify or repeal them, it may well be doubted whether it would be competent to provide in the by-laws themselves for their temporary suspension, and still less to suspend them in the absence of such provision.   But on examination of the by-laws themselves we find no authority for suspending the provisions relating to passage of ordinances.   By the last chapter they may be amended at any regular meeting by affirmative vote of three members, on written notice given at the previous regular meeting.   Chapter 16 of the 1903 edition (seventeen of that of 1905) is entitled "Rules of Order" and embodies regulations as to the order of business and conduct of meetings customary in such cases.   Rule 23 of this chapter reads as follows: "No departure from the regular order of business nor suspension of any rule shall be allowed except by the acquiescence of a majority of the whole number of commissioners of the board." This rule is invoked by defendants as authorizing the suspension of section 2 of chapter 15 (sixteen) requiring publication of ordinances between first and second readings, but in our view it refers only to the "Rules of Order" of which it is one, and not to the other by-laws.   If this were not so, it would be practicable by a vote of three at any meeting without notice, to nullify the fundamental provisions relating to the permanent officers and their duties, management of finances, giving out of contracts for public improvements and payments for same, bonds of officials and employes, and so on.   All these matters, as also the provisions relating to the passage of ordinances, are the subject of separate chapters, and properly so, as they bear on the interests of the public and not merely on the convenience of handling the business of a meeting, and it is evident that if they can be rendered nugatory by the suspension of a mere rule of order, the by-laws are little more than a suggestion instead of being, as they should be, a set of regulations for the transaction of public business by a public body, on which regulations the public itself has a right to rely.   The more radical proposition is also advanced that, as the vote was unanimous to suspend the by-law and pass the

ordinance, no one can be heard to complain. But this likewise loses sight of the right of the public to expect that ordinances, involving as they do the interests of the public, shall be enacted in due form as provided by law, and that part of that law is the regulations adopted and promulgated by the legislating body. The ordinance in question was one in which the public were vitally interested. It involved the privileges in the streets of a vast system of street car lines; the terms and method of their payment for such privileges; the applicability of those terms to future lines within the existing city limits, and present and future lines in territory which might be subsequently annexed, and the perpetuation of certain limited franchises, thus tying the hands of future boards in their dealings with the street railroads and surrendering claims previously asserted as valid. It is said, and may be true, that valuable concessions were made in return by the railroads to the city, but this in no way disproves the facts that the transaction was one of very great importance to the city and its people, and that its revenues and the right to use of its streets were involved for both present and future. Public rights may not be dealt with in such off-hand fashion. It is doubtless true, as claimed, that very careful consideration was given to this ordinance and the contract it purports to ratify, both before and at the meeting, by the commissioners themselves and other city officials. But this again does not answer the proposition that the public have a right to rely on the pursuit of the orderly course of procedure as to passage of ordinances as laid down in the by-laws of the board. In *Hicks* v. *Long Branch Commission,* 40 *Vroom* 300, the Court of Errors and Appeals, reversing the Supreme Court, held that a resolution involving the expenditure of moneys should be set aside for mere failure to comply with a rule requiring the yeas and nays to be recorded, basing the decision on the right of the public to know the votes of individual members and to hold them accountable therefor. So in this case, if the ordinance had been advertised as required by the by-laws, and the public thereby apprised of what was contemplated, material benefit to the city might have resulted. In any

event, by non-publication, the citizens and taxpayers were deprived of their right to know what was being done and to express their views thereon to their legislative agents.

Our conclusion, therefore, is that the by-law requiring advertisement of this ordinance between first and second readings was disregarded, and was not and could not be suspended by the action that was taken, and that the ordinance was in consequence not legally passed, and for that reason must be set aside.

This conclusion renders it unnecessary to discuss the other reasons advanced.